**AMERICAN PHARMACEUTICAL ASSO-CIATION et al., Plaintiffs,**

**v.**

**Caspar W. WEINBERGER et al., Defendants.**

**Civ. A. No. 1485-73.**

United States District Court, District of Columbia.

June 6, 1974.

Arthur B. Hanson and Joel E. Hoffman, Washington, D. C. (W. Frank Stickle, Jr., Hanson, O'Brien, Birney, Stickle & Butler; Selma M. Levine and Mark Schattner, Wald, Harkrader & Ross on the briefs), Washington, D. C., for plaintiffs.

Peter Barton Hutt, Asst. Gen. Counsel Food and Drug Division, Dept. of Health, Education, and Welfare (Earl J. Silbert, U. S. Atty., Arnold T. Aikens and Eric B. Marcy, Asst. U. S. Attys., Jeffrey B. Springer, Howard M. Holstein, Alan R. Bennett, Attys., Office of Gen. Counsel, Food and Drug Division, Dept. of Health, Education, and Welfare on the briefs), for defendants.

## OPINION AND ORDER

JOHN H. PRATT, District Judge.

This is an action for judicial review of a regulation of the Food and Drug Administration (FDA) which restricts the distribution of methadone to certain specified outlets as set forth in the regulation. In effect, it prohibits virtually all licensed pharmacies from dispensing this drug when lawfully prescribed by a physician, despite the fact that methadone was invented and was first used as a safe, useful and effective agent in the treatment of severe pain and for antitussive purposes. Decision is not made easier by the fact that in recent years methadone has become a widely known maintenance agent in the treatment of heroin addicts and there is evidence of serious abuses in the distribution of this drug. In their efforts to control improper distribution of methadone, there are strong public policy arguments on the side of defendants. At the same time, the popularity of methadone for use as a pain killer has declined because of the introduction of effective new drugs, and as recently as 1972 the plaintiff Association formally recommended that FDA withdraw its approval of methadone for its indications as an analgesic and antitussive and expressed its philosophic non-disagreement with a course of regulation which would restrict the distribution and use of methadone to approved methadone treatment programs.

The challenged regulation, while ruling out most so-called community pharmacies in the dispensing of methadone for any purpose, still permits approved hospital pharmacies to dispense methadone for analgesic and antitussive purposes. Stripped of the rhetoric which abounds in the papers before us, this appears to be the basis of plaintiffs' complaint. Whether the FDA has the authority to enact the challenged regulation depends on the interplay and connection between two complementary but distinct statutes, the Food, Drug and Cosmetic Act of 1938 and the Compre-

hensive Drug Abuse Prevention & Control Act of 1970 and the respective roles assigned by Congress to the agencies which administer these Acts. With this brief background, we proceed to the issues presented.

This cause came on for hearing on defendants' motion to dismiss, or in the alternative, for summary judgment and plaintiffs' cross-motion for summary judgment on May 8, 1974. Plaintiffs challenge the validity of certain provisions of the Food and Drug Administration's methadone regulations, 21 C.F.R. § 130.44 ("Conditions for use of methadone") and § 130.48 ("Drugs that are subjects of approved new-drug applications and that require special studies, records and reports.")[1] Specifically, plaintiffs object to those parts of the regulations which purport to restrict the distribution of methadone to direct shipments from the manufacturer to (a) approved maintenance treatment programs, (b) approved hospital pharmacies, and (c) in cases where hospital pharmacies are unavailable in a particular area, to selected community pharmacies.[2]

Plaintiffs include the American Pharmaceutical Association (APhA), a professional association of pharmacists with a membership in excess of 50,000, three individual professional pharmacists and an individual physician. They argue that the restrictions imposed on the channels of distribution exceed the limits of FDA's authority, were promulgated on the basis of an inadequate record and, being discriminatory in several respects, violate the due process clause of the Fifth Amendment. Plaintiffs seek declaratory relief holding said restrictions invalid and enjoining defendants from enforcing them.

■ Defendants are the Secretary of Health, Education and Welfare, the Commissioner of Food and Drugs, the Attorney General and the Acting Administrator of the Drug Enforcement Administration. They counter plaintiffs' contentions by citing FDA's authority under the Federal Food, Drug and Cosmetic Act (the Act), 21 U.S.C. § 301 et seq., to control access to the public market of all new drugs (21 U.S.C. § 335) and to promulgate regulations for the efficient enforcement of the Act (21 U.S.C. § 371(a)) and their authority under the Comprehensive Drug Abuse Prevention & Control Act of 1970 (Pub.L. 91–513, 84 Stat. 1241) "[to] determine the appropriate methods of professional practice in the medical treatment of . . . narcotic addicts. . . ." (42 U.S.C. § 257a)[3] With respect to plaintiffs' contention that the regulations in question constitute arbitrary and capricious action not supported by the administrative record, defendants note what they argue is "ample evidence" to support the regulation's restrictions on methadone distribution. See defendants'

1. The Commissioner of Food and Drugs published the notice of proposed rule making on April 6, 1972. 37 Fed.Reg. 6940–46. The final methadone regulations were promulgated on December 15, 1972. 37 Fed.Reg. 26790–26807. Some portions of the regulation became effective on that date and the remainder became effective March 15, 1973.

2. 21 C.F.R. § 130.44(f)(4) reads:
   *Shipments to remote areas.* In remote areas or in certain exceptional circumstances where there are no approved hospitals, community pharmacies may be approved by the Food and Drug Administration to receive shipments of methadone for administering or dispensing for analgesia upon the recommendation of the State authority and after consultation with the Bureau of Narcotics and Dangerous Drugs. In addition, community pharmacies are permitted to serve as dispensing facilities for out-patient subjects in connection with approved methadone treatment programs (37 Fed.Reg. 26790) and wholesale pharmacy outlets may in some instances receive and stock methadone for trans-shipment to approved dispensers. 21 C.F.R. § 130.44(j)(1).

3. At oral argument counsel for the defendants relied solely on FDA's authority under the new drug approval (NDA) provisions of the Act, specifically 21 U.S.C. § 355(d) which lists among the grounds for refusing approval of an NDA a finding that the new drug is either unsafe for use under the conditions prescribed or has not been proven to be safe under such conditions. Accordingly, the Court will not specifically address the position taken by defendants in their memoranda that the challenged portions of the regulation rest on FDA's combined authority under both the NDA and the investigational-new-drug (IND) provisions of the Act set forth in 21 U.S.C. § 355(i).

Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment, pp. 22–29. Finally, in answering plaintiffs' due process challenge, defendants urge that they need only demonstrate a rational basis for the regulations in order to satisfy the Constitution and that the classifications in issue are unquestionably rationally based in the purposes of the enabling statute. Since the Court concludes that the regulation exceeds the limits of FDA's statutory authority insofar as it purports to restrict the channels of distribution for a drug which is not deemed solely investigational, the Court need not address plaintiffs' latter two arguments.

## I.

The drug methadone, a synthetic substitute for morphine, is a "new" drug within the meaning of section 201(p) of the Federal, Food, Drug and Cosmetic Act, 21 U.S.C. § 321(p) and, as a new drug, requires FDA's approval of a NDA, filed with the Commissioner of Food and Drugs[4] pursuant to section 505(b) of the Act, 21 U.S.C. § 355(b). The drug was first approved by FDA in the 1950's as safe for use as an analgesic and antitussive agent as well as for short-term detoxification of persons addicted to heroin. Subsequently, investigation of methadone for use in long-term maintenance of narcotic addicts (methadone maintenance) was approved by FDA pursuant to its authority under 21 U.S.C. § 355(i), the investigational new-drug (IND) exemption. Section 355(i) of the Act empowers FDA to exempt from NDA approval requirements those new drugs "intended solely for investigational use by experts qualified by scientific training and experience to investigate the safety and effectiveness of drugs." Final guidelines for long-term maintenance programs were promulgat-

ed by FDA in 1971. 36 Fed.Reg. 6075 (1971). A year later FDA determined that "retention of the drug [methadone] solely on an investigational status appears to be no longer warranted" (37 Fed.Reg. 6940) and published a notice of proposed rulemaking which resulted, with certain modifications, in the regulations now in question.

The final regulation gave notice that pursuant to FDA's authority under 21 U.S.C. § 355(c), the Commissioner was withdrawing approval of all outstanding NDA's because of "a lack of substantial evidence that methadone is safe and effective for. detoxification, analgesia, or antitussive use *under the conditions of use that presently exist.*"[5] 37 Fed.Reg. 26794 (1972). Having withdrawn all approved NDA's, the Commission's new regulatory scheme is presently the exclusive means of distribution for the drug methadone. The Commissioner has thereby created an admittedly unique classification for methadone since on the one hand he has determined that methadone should not be limited solely to investigational status while at the same time concluding that the drug is inappropriate for regular NDA approval. As statutory support for this novel solution to the methadone dilemma, defendants rely on an expansive interpretation of the Commissioner's NDA authority under § 355 of the Act.

## II.

Under the Federal Food, Drug and Cosmetic Act, the FDA (through the Secretary of HEW) has the responsibility of passing on the merits of NDA's. The grounds upon which an NDA can be denied approval are explicitly stated in subsection (d) of § 355 and the NDA shall be approved "if [FDA] . . . finds that none of the grounds for denying approval . . . applies." 21 U.

---

4. The functions vested in the Secretary of the Department of Health, Education and Welfare by the Federal Food, Drug and Cosmetic Act have been delegated to the Commissioner of Food and Drugs. 21 C.F.R. § 2.120.

5. Although the Commissioner notes a lack of evidence with respect to methadone's effectiveness for the enumerated uses, defendants have relied, exclusively on the drug's alleged safety hazard in attempting to justify the challenged restrictions on distributions.

S.C. § 355(c). The NDA must be supported by "substantial evidence" defined to mean "evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could be fairly and responsibly concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof." 21 U.S.C. § 355(d).

One of the six enumerated grounds for refusing approval of a new drug application (NDA) specifically deals with the "methods" or "controls" used in connection with the proffered drug. Subsection (d)(3) of § 355 reads as follows:

> (d) If the Secretary finds
>
> \*  \*  \*  \*  \*  \*
>
> (3) the methods used in, and the facilities and controls used for, the *manufacture, processing,* and *packing* of such drug are inadequate to preserve its identity, strength, quality, and purity;
>
> \*  \*  \*  \*  \*  \*
>
> he shall issue an order refusing to approve the application. (Emphasis supplied)

This is the only provision of § 355 which speaks of the Secretary's authority with respect to "controls." The Congress apparently intended that the Secretary, or his delegate, FDA, be responsible for the adequacy of premarketing methods and controls inasmuch as the provision delineates the scope of the provision to the manufacturing, processing and packaging stage of a drug's genesis.

The defendants point out, however, that § 355(d) also gives the Secretary the authority to refuse to approve an NDA where the reports of the investigations submitted do not include adequate tests showing whether the new drug is "safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof." 21 U.S.C. § 355(d)(1). See also 21 U.S.C. § 355(d)(2) and (4). Defendants argue that the term "safe" [6] should be interpreted with reference not only to the inherent qualities of the drug under consideration but also in the sense of the drug's being secure from possible misuse. Such a broad interpretation would, according to defendants' theory, serve as the statutory foundation for FDA's exercise of authority in restricting methadone's channels of distribution because FDA's principal rationale for restricting distribution was "to help reduce the likelihood of diversion." 37 Fed.Reg. 26790 (1972).

As a general proposition of statutory construction, a general term should not be construed in isolation but should be interpreted according to the context of the statute within which it is found.[7] As noted above, the term "safe" is used in conjunction with the phrase "for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof." When taken in this context, a determination of whether a drug is "safe" is premised on the drug's use in the "prescribed, recommended, or suggested" manner. Thus the context of the statute indicates that the term "safe" was intended to include only the inherent safety of the drug when used in the manner intended. Moreover, as also noted above, the subject of "controls" is specifically covered in provision (3) of the same subsection (d) wherein the term "safe" appears. Provision (3) extends the Secretary's authority to pass on the adequacy of

---

6. The term "safe" is defined by section 321(u) of the Act as referring to the "health of man or animal." This definition is not directly made applicable to § 355 but because it is made applicable to the definition of "new drug" it would seem to be applicable by implication to § 355. Although the definition is itself ambiguous, in the context of the Act it tends to support the Court's conclusion.

7. *See, e. g.,* Sutherland Statutory Construction 47.01 (Sands, 4th ed. 1973).

methods, facilities and *controls* only with respect to *manufacturing, processing* and *packaging*. Under the doctrine of "expressio unius est exclusio alterius" [8] any stage of the drug's genesis not specifically mentioned in provision (3) was presumably intended to be excluded from the Secretary's authority. Thus by examining the term "safe" in the context of those provisions of the Act in which it appears as well as in relationship to the provision of the Act which specifically deals with controls, the Court concludes that the term "safe" was intended to refer to a determination of the inherent safety or lack thereof of the drug under consideration when used for its intended purpose.[9]

Finally, the legislative history of the Act fully supports this conclusion. In enacting the Comprehensive Drug Abuse Prevention and Control Act of 1970, Congress was presented with a conscious decision as to how the lines of authority should be drawn with respect to the regulation of dangerous drugs. Congress decided to continue all control authority over the distribution of dangerous drugs in the Justice Department despite a recommendation of the Prettyman Commission that this function be transferred to HEW.[10] The House Committee on Interstate and Foreign Commerce in their report on the Comprehensive Drug Abuse Prevention and Control Act of 1970 indicated that Title II of that Act, known as the Controlled Substances Act, was designed to "provide authority for the Department of Justice to keep track of all drugs subject to abuse manufactured or distributed in the United States in order to prevent diversion of these drugs from legitimate channels of commerce."[11] Although it is nowhere specifically stated that Congress contemplated that the Justice Department would have exclusive authority to prevent diversion, this result would appear logically to follow from a comparison of the functions delegated to the Secretary of HEW with those assigned to the Attorney General.

### III.

In addition to being a "new" drug and thus within the jurisdiction of the FDA, methadone is a controlled substance within Schedule II of the Controlled Substances Act, 21 U.S.C. § 812. Under this Act the Attorney General is made responsible for the registration of any person who manufactures, distributes or dispenses any controlled substance. 21 U.S.C. § 822. An applicant may be refused registration if the Attorney General makes a determination that registering the applicant would be inconsistent with the public interest.[12] Congress has also provided the specific means for revoking or suspending the authority of a registrant to distribute controlled substances. Section 824 of Title 21 enumerates three grounds upon which the Attorney General may act:

(a) A registration pursuant to section 823 of this title to manufacture,

---

8. *Id.* at § 47.23.

9. Even if the Court were to agree with defendant's interpretation of the term "safe," this alone would not provide a statutory basis for the regulations challenged herein. At most such an interpretation would authorize FDA to deny or withdraw any methadone NDA based on a finding that the drug could not be "safely" distributed. As outlined in the Court's opinion, FDA's discretion under the Act's NDA provisions is limited to either approving or denying NDA's and nowhere is FDA empowered to approve an NDA upon the condition that the drug be distributed only through specified channels.

10. Recommendation No. 9, Advisory Commission on Narcotics & Drug Abuse, reprinted

in H.Rep.No.91–1444 (pt. 1), 91st Cong., 2d Sess. 16–20 (1970).

11. H.Rep.No.91–1444 (pt. 1), *supra* at 22.

12. "In determining the public interest, the following factors shall be considered:
(1) maintenance of effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels;
       *       *       *       *       *
(3) prior conviction record of applicant under Federal or State laws relating to the manufacture, distribution, or dispensing of such substances;
(4) past experience in the distribution of controlled substances;" (21 U.S.C. § 823(b))

distribute, or dispense a controlled substance may be suspended or revoked by the Attorney General upon a finding that the registrant—

(1) has materially falsified any application filed pursuant to or required by this subchapter or subchapter II of this chapter;

(2) has been convicted of a felony under this subchapter or subchapter II of this chapter or any other law of the United States, or of any State, relating to any substance defined in this subchapter as a controlled substance; or

(3) has had his State license or registration suspended, revoked, or denied by competent State authority and is no longer authorized by State law to engage in the manufacturing, distribution, or dispensing of controlled substances.[13]

In addition, Congress has specified the precise procedure to be followed by the Attorney General in attempting to revoke or suspend a registration. 21 U.S.C. § 824(c).

■ The Court concludes that Congress intended to create two complementary institutional checks on the production and marketing of new drugs. At the production or pre-marketing stage, the FDA is given the primary responsibility in determining which new drugs should be permitted to enter the flow of commerce. The Commissioner must approve or deny every NDA, or he may determine that a particular new drug qualifies for IND status in order to permit additional experimentation. When an IND exemption is approved, the Commissioner may, of course, severely restrict the distribution of the exempted drug to bona fide researchers and clinicians. But once a drug is cleared for marketing by way of a NDA-approval, for whatever uses the Commissioner deems appropriate, the question of permissible distribution of the drug, when that drug is a controlled substance, is one clearly within the jurisdiction of the Justice Department. The diversion of the particular drug to a use not approved by the Commissioner would be grounds for revocation of the offending distributor's registration.[14] FDA attempts to accomplish peremptorily by way of its challenged regulation, that which could only be accomplished, according to the scheme of the Controlled Substances Act, by way of show-cause proceedings initiated by the Attorney General, i.e., revoking the authority of otherwise duly-registered distributors with respect to the drug methadone. To allow the challenged portions of the methadone regulations to stand, therefore, would be to abrogate the collective judgment of Congress with regard to the appropriate means of controlling unlawful drug diversion.

This is particularly true of the regulations' denial of authority to the plaintiffs at bar. Although the Attorney General generally has discretion to register applicants wishing to distribute or dispense controlled substances, 21 U.S.C. § 823(b), in the case of "practitioners"[15] the Attorney General *must* register them "if they are authorized to dispense under the law of the State in which they regularly conduct business." 21 U.S.C. § 823(f). Congress has thereby specifically sanctioned the registration of all State-licensed practitioners with the clear intent of permitting them to dispense controlled substances on an equal basis with all other approved distributors. In the face of such clear-cut Congressional intent, it would be anomalous to suggest that an

---

13. 21 U.S.C. § 824(a).

14. *Id.* Although revocation stemming from unlawful diversion is a somewhat cumbersome process under the current standards of § 824(a), Congress has recently taken the initiative in supplementing DEA's authority in this respect. *See* note 17 *supra.*

15. 21 U.S.C. § 802(20) defines the term "practitioner" to include, *inter alia,* a physician, scientific investigator, pharmacy or "other person licensed . . . to distribute . . . a controlled substance in the course of professional practice or research."

agency, by the mere issuance of a regulation, could modify these mandated channels of distribution. Accordingly, the Court concludes that FDA has overstepped the bounds of its authority in purporting to limit the distribution of methadone in the manner contemplated by its regulations.

## IV.

It is undoubtedly true that methadone poses unique problems of medical judgment, law enforcement and public policy but this fact alone cannot justify a federal agency of specifically delimited jurisdiction from implementing equally unique control solutions not authorized by Congress. The problem of unlawful diversion is one presently consigned by Congress to the Drug Enforcement Administration (DEA, formerly the Bureau of Narcotics and Dangerous Drugs) of the Department of Justice. FDA, on the other hand, has the responsibility of making the initial decision, based on all available medical and scientific data, as to whether a particular new drug is safe and effective for its intended use. While the functions of FDA and DEA are not entirely exclusive of one another,[16] a certain division of authority and responsibility was clearly intended by Congress and must be recognized by this Court in order to preserve the integrity of the legislative scheme. Under these circumstances, the relative merits of FDA's plan to control

the distribution of methadone, a controlled substance, must first be passed upon by Congress.[17]

Wherefore, for all the foregoing reasons, it is this 5th day of June, 1974,

Ordered, that plaintiffs' motion for summary judgment be, and the same hereby is, granted; and it is

Further ordered, that defendants' motion to dismiss, or in the alternative, for summary judgment be, and the same hereby is, denied.

Order to be settled on notice.

16. For example, the Attorney General, in exercising his authority under 21 U.S.C. § 811(a) to add or remove drugs from the schedules of controlled substances established by the Controlled Substances Act, must first call upon FDA for its recommendation. The recommendations of FDA, insofar as they concern "scientific and medical matters" relating to the "appropriate schedule, if any, under which such drug or substance should be listed" are binding on the Attorney General. 21 U.S.C. § 811(b).

17. In a related effort to streamline the enforcement authority of DEA, both Houses of Congress recently passed a proposed amendment to the Controlled Substances Act. Specifically, the amendment gives the Attorney General expanded authority to require

special registration of those practitioners who dispense or administer narcotic drugs in connection with treatment programs and to peremptorily revoke such registration in the event that a particular registrant fails to comply with the drug security standards imposed by the Attorney General. See H. Rep.No.93-884, 93d Cong., 2d Sess. 11–13 (1974); S.Rep.No.93–192, 93d Cong., 1st Sess. 21 (1973). This legislation indicates Congress' keen awareness of the problem of diversion and their willingness to consider sound proposals to meet the growing crisis. Again we can only re-emphasize that the merits of that portion of FDA's regulations under challenge here concern legislative issues which must first be addressed to Congress.