**AMERICAN PHARMACEUTICAL ASSOCIATION et al.**

v.

**David MATHEWS et al., Appellants.**

**No. 74-1989.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 4, 1975.

Decided Feb. 11, 1976.

Thomas Scarlett, Atty., Food and Drug Div., Dept. of Health, Ed. and Welfare, Washington, D. C., with whom Peter Barton Hutt, Asst. Gen. Counsel, Howard M. Holstein, Atty., Food and Drug Div., Dept. of Health, Ed. and Welfare, Washington, D. C., and Samuel R. Simon, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellants. Howard E. Shapiro, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for appellants.

Joel E. Hoffman, Washington, D. C., with whom Arthur B. Hanson, W. Frank Stickle, Jr. and Selma M. Levine, Washington, D. C., were on the brief, for appellees.

Before McGOWAN, TAMM and ROBB, Circuit Judges.

PER CURIAM:

The judgment appealed from is affirmed on the basis of the opinion of the District Court (The Honorable John H. Pratt, District Judge). See 377 F.Supp. 824 (D.D.C.1974).

McGOWAN, Circuit Judge (concurring in the result):

Although I concur in affirming the District Court, I find unpersuasive two

theories advanced in its opinion, and appellees' failure to rely upon them on appeal appears to reflect my own doubts.[1]

In my view, the critical issue is whether, as appellees argue, the regulations at issue fall outside the scope of the authority delegated by Congress to the FDA. The Commissioner of the FDA has himself expressed some uncertainty on this score. *See* Schmidt, *The FDA in 1985*, Address delivered on Nov. 5, 1975 at the Tulane Medical Symposium, New Orleans, La.; Schmidt, *Our Changing Drug Laws: More Change Needed?*, Address delivered on October 15, 1975 at the Johns Hopkins University School of Medicine, Baltimore, Md. Upon examining this question, I have concluded—not without great difficulty—that appellees should prevail.

The pivotal provision of the Federal Food, Drug and Cosmetic Act is 21 U.S.C. § 355(d), which prohibits the approval of a new drug application unless there are adequate data to establish that the "drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof . . . ." The FDA contends that where there exists a documented pattern of drug misuse contrary to the intended uses specified in the labelling, the drug is unsafe for approval unless controls over distribution are imposed. As a corollary, it asserts that for a drug such as methadone, for which there is substantial evidence of misuse, the FDA must have the power to restrict distribution to avoid the dilemma of either disapproving a drug with important therapeutic benefits or of placing on the market a drug likely to be misused. The FDA claims that section 355(d) authorized restricting distribution to a prescription-only basis before the FDA was explicitly granted that authority in 1951, and that the regulations at issue differ only in degree from a prescription-only restriction.

Although these arguments have some weight, I do not find them ultimately convincing. The word "safe" in section 355(d) is, to my mind, best interpreted as requiring the labelling to include the evidence from drug testing, and the inferences therefrom, indicating the therapeutic benefits, possible dangers, and uncertainties involved in use of a drug, as an aid to a conscientious physician in determining appropriate medical treatment. That view seems to me to accord with both the most reasonable interpretation of the statutory language and the common understanding of the FDA's mission. Thus, methadone is safe for its intended use notwithstanding the possibility that it will be employed in unintended fashions.

The controls on distribution here are different in kind from prescription-only restrictions. The latter restrictions prevent self-diagnosis by the layman. If such restrictions had not been permitted before 1951, drug labelling would have had to include both specific medical evidence about a drug and all the general medical knowledge that a physician must possess in order to decide, after reading a labelling, whether to administer a

---

1. The first theory is that the explicit grant of authority in 21 U.S.C. § 355(d)(3) (1970) to consider "the methods used in, and the facilities and *controls* used for, the manufacture, processing, and packing of [a] drug" (emphasis supplied) as a basis for denying a new drug application creates a negative implication that the FDA lacks authority to consider the adequacy of *controls* on distribution of drugs after their production. *See* 377 F.Supp. at 828–29. The apparent applicability of a canon of statutory construction is by itself a thin reed to stand on; here, reliance on that canon obscures the fact that the controls on distribution contained in the proposed regulations are entirely different in nature from the controls on manufacture discussed in § 355(d)(3). The second theory is that passage of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.* (1970), vested exclusive authority in the Justice Department to monitor distribution of drugs regulated by that legislation. *See* 377 F.Supp. at 829–30. Whatever the limits of the FDA's authority under its own enabling legislation, there is simply an inadequate basis for concluding that the Controlled Substances Act implicitly repealed any authority that the FDA might possess to regulate the channels of drug distribution. *See* § 707 of Title II of the Controlled Substances Act, 21 U.S.C. § 902 (1970):

> Nothing in this chapter . . . shall be construed as in any way affecting, modifying, repealing, or superseding the provisions of the Federal Food, Drug, and Cosmetic Act.

drug. Although one might contend in theory that any drug is safe for its intended use if the labelling contains enough information, it is evident that a layman cannot be expected to digest a mass of complicated medical information and bring to bear upon it the medical judgment of a practicing physician. Thus, restrictions to a prescription-only basis are necessary to ensure that persons intending to use drugs in accordance with the implications of medical evidence gathered by the FDA and contained in a drug labelling can do so. The restrictions on methadone involved here are quite different. Without them an informed and sound medical judgment about medical safety and effectiveness can still be made. They are designed instead to control drug misuse by persons who have no intent to try to use drugs for medical purposes.

There would be almost no limit to the FDA's authority were its view adopted. If, for example, it had concluded before 1970 that without restrictions on methadone of the sort now contained in the Controlled Substances Act, 21 U.S.C. § 801 *et seq.* (1970), the possibility of drug misuse remained high, there would be no barrier under its argument to its having established a regulatory scheme of the complexity of that ultimately adopted in that Act. Thus, under the authority of section 355(d) (and the general power to promulgate implementing regulations in section 371(a)), the FDA might have established a comprehensive registration scheme, complete with detailed record-keeping, security, and inspection requirements. I do not believe that the current grant of statutory authority contemplates such activity by the FDA, but accepting the FDA's view would require upholding far-ranging regulation of that sort.

Physicians and state-licensed pharmacists have not been uniformly responsible in dealing with methadone, and the FDA undoubtedly has genuine cause to believe that, with respect to both narcotic and non-narcotic drugs, effective regulation in the public interest necessitates authority on its part to restrict distribution channels when the risk of unintended uses is great and the consequences of misuse are very harmful. Under the present statutory framework, however, I believe that argument must be addressed to Congress.