**NATIONAL CONFECTIONERS ASSOCIATION, Appellant,**

v.

**Joseph A. CALIFANO, Jr., Secretary of Health, Education and Welfare, et al.**

**No. 76–1617.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 22, 1977.

Decided Jan. 20, 1978.

Alan H. Kaplan, Washington, D. C., with whom F. Kaid Benfield, Washington, D. C., was on the brief for appellant.

Arthur E. Korkosz, Atty., Consumer Affairs Section, Dept. of Justice, Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Richard A. Merrill, Chief Counsel, Forrest T. Patterson, Assoc. Chief Counsel, Food and Drug Administration, Charles R. McConachie, Acting Chief, Consumer Affairs Section, Dept. of Justice, Washington, D. C., were on the brief for appellees.

Before ROBINSON, MacKINNON and ROBB, Circuit Judges.

Opinion for the Court filed by ROBB, Circuit Judge.

ROBB, Circuit Judge:

The appellant National Confectioners Association (NCA), a trade association of candymakers,[1] appeals from a judgment of the District Court granting summary judgment to the Secretary of Health, Education and Welfare and the Commissioner of Food and Drugs (Collectively, FDA). We affirm.

The Association asked the District Court to declare void and to enjoin enforcement of portions of a Food and Drug Administration Regulation entitled "Cacao Products and Confectionary", 21 C.F.R. § 128c (1976).[2] The Association attacked the parts

---

1. Five of its members did not participate in this litigation.

2. This Regulation is one of a series of "Good Manufacturing Practice" regulations promul-

gated for specific segments of the food industry. The particular "Good Manufacturing Practice" regulations supplement a general regulation, promulgated in 1969, that pertains to the entire food industry. 21 C.F.R. § 128

of the Regulations that require candymakers (1) to mark each shipping container with a code that identifies the plant where the candy was packed and its production or packaging lot, 21 C.F.R. 128c.7(d) (1976),[3] and (2) to keep records of the initial distribution of the candy for a period exceeding its shelf life but not more than two years, 21 C.F.R. § 128c.8(c), (d) (1976).[4] According to the Association, the challenged requirements are in excess of statutory authority and arbitrary because the need for them is not supported by record evidence. The relevant statute is the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.*

The "Good Manufacturing Practice" Regulation at issue here was promulgated under authority granted to the Secretary of Health, Education and Welfare by section 701(a) of the Act, 21 U.S.C. § 371(a), "to promulgate regulations for the efficient enforcement of this [Act]".[5] The Act prohibits the "introduction or delivery for introduction into interstate commerce of any food . . . that is adulterated", the "adulteration . . . of any food in interstate commerce", and the "receipt in interstate commerce of any food . . . that is adulterated". 21 U.S.C. § 331(a)–(c). The FDA intends that its Regulation will implement section 402(a)(4) of the Act, 21 U.S.C. § 342(a)(4), which states that:

A food shall be deemed to be adulterated—

　　＊　　＊　　＊　　＊　　＊　　＊

(4) if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health . . .

The FDA justified the contested provisions of its Regulation in this way:

The Commissioner is of the opinion that the benefits to the consumer from [the record-keeping] requirements are clear. It would expedite the recall of dangerous or potentially dangerous products from the market. He considers the requirement to be a logical companion to the one for coding . . . and that it serves the same purpose in protecting the public health. The rapid identification of suspected food lots by their code marks together with a knowledge of the meaning of the code marks and a knowledge of their distribution can make a recall much easier and faster and thus result in increased consumer protection.

40 Fed.Reg. 24,169 at ¶ 92 (1975).

## STATUTORY BASIS FOR THE CONTESTED PROVISIONS OF THE REGULATION

The Association's argument rests on this premise: because the FDA has cited section 402(a)(4) as the substantive basis for its Regulation, that section alone must provide the statutory justification for the Regulation. The Association asserts that previous judicial and administrative interpretations of section 402(a)(4) indicate that Congress intended it to control the physical processes of manufacture, to *prevent* contaminated foods from entering commerce. By con-

---

(1976). The general Good Manufacturing Practice regulation refers to source coding and distribution records but does not mandate them. 21 C.F.R. § 128.7(i) (1976).

3. The provision states:
   (d) *Coding.* Permanently legible code marks shall be placed at a readily visible location on each shipping container or they shall be placed on each finished product package delivered or displayed to retail purchasers and be visible on the unopened package. The code marks may be placed in both locations if desired by the manufacturer. Such marks shall identify at least the plant where packed and the product lot or packaging lot.

4. The provision states:
   (c) Records shall be maintained to identify the initial distribution of the finished product to facilitate, when necessary, the segregation of specific food lots that may have become contaminated or otherwise rendered unfit for their intended use.
   (d) The records required by paragraphs (a), (b), and (c) of this section shall be retained for a period of time that exceeds the shelf life of the finished product, except that they need not be retained more than 2 years.

5. The Secretary has delegated administration of the Act to the Commissioner of Food and Drugs. 21 C.F.R. § 2.120 (1976).

trast, the mandatory coding and record-keeping provisions contemplate a *remedy* for contaminated foods already in commerce, by expediting their location and removal. Therefore, the Association concludes, these provisions are alien to the settled meaning of section 402(a)(4). Stressing the distinction it draws between prevention and remedy,[6] the Association observes that the contested provisions would permit criminal prosecution under section 402(a)(4) of a manufacturer, whose processes are sanitary but whose source coding and distribution records are deficient, for having "prepared, packed, or held [food] under insanitary conditions . . . whereby it may have been rendered injurious to health". Criminal liability for such conduct, says the Association, would distort the language of section 402(a)(4) impermissibly. Finally, the Association states that the FDA, by justifying the contested provisions on a need to expedite "recalls"[7] of adulterated foods, has clearly exceeded its statutory authority, because recalls are voluntary actions by manufacturers. Recalls are not among the remedial alternatives given to the FDA in the Act[8] and therefore, the Association concludes, not subject to regulation by the FDA.

■ We believe that the Association's analysis of the FDA's statutory authority is unreasonably cramped. At the outset we must reject the Association's contention that the validity of the contested provisions must stand or fall on section 402(a)(4) alone. There is no persuasive evidence that Congress intended to immunize food manufacturers from mandatory source coding and record-keeping.[9] Therefore, in assessing the validity of regulations promulgated under section 701(a) for the *efficient* enforcement of the Act, we must consider "whether the statutory scheme as a whole justified promulgation of the regulation." *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 163, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967). The consideration concerns "not merely an inquiry into statutory purpose" but also practicalities, such as "an understanding of what types of enforcement problems are encountered by the FDA [and] the need for various sorts of supervision in order to effectuate the goals of the Act." *Id.* at 163–64, 87 S.Ct. at 1524. "The Act is not concerned with the purification of the stream of commerce in the abstract. The problem is a practical one of consumer protection, not dialectics." *United States v. Urbuteit,* 335 U.S. 355, 357–58, 69 S.Ct. 112, 114, 93 L.Ed. 61 (1948).

Turning to the relevant aspects of the statutory scheme, we find that if a unit of food in fact contains contaminants that render it "injurious to health", 21 U.S.C. § 342(a)(1), that are "filthy, putrid, or decomposed substance[s]" present in signifi-

**6.** Apparently guided by this distinction, the Association did not challenge the provisions in the Regulation that deal with food processing procedures. We therefore have no occasion to consider their validity under the statute. The processing provisions, which comprise the bulk of the Regulation, cover such topics as condition of plant, equipment and utensils; personnel and equipment sanitation; and handling and storage procedures for raw materials and finished products.

**7.** In a "recall" a manufacturer undertakes to recover his product from distributors and retailers.

**8.** The FDA may enforce the statute by obtaining court-ordered injunctions, 21 U.S.C. § 332(a), fines and imprisonment, 21 U.S.C. § 333, and seizures, 21 U.S.C. § 334(a).

**9.** The appellant directs our attention to a bill, S. 641, introduced in the Second Session of the 94th Congress. The bill would give the FDA explicit authority to require food manufacturers to use source codes and to keep distribution records. The bill has not been enacted. We cannot accept petitioner's assertion that its existence indicates that Congress intended to exclude such authority from the Act as it is presently written. We acknowledge that 21 U.S.C. § 373 requires that only food carriers and recipients, not manufacturers, allow FDA officials to inspect records voluntarily kept in the exercise of business judgment. We think, however, that the narrower scope of this provision does not preclude the imposition of a limited records-keeping requirement on food manufacturers, when the requirement clearly assists the efficient enforcement of the Act and when there is no evidence that the burden of record-keeping would be unreasonably onerous.

cant quantity [10] or that make it "otherwise unfit for food", 21 U.S.C. § 342(a)(3), it is "adulterated". Moreover, if a unit of food is processed, packed, or stored under unsanitary conditions whereby it may have become contaminated or rendered injurious to health, it is "adulterated" in the eyes of the law even though it is not actually contaminated. 21 U.S.C. § 342(a)(4); *Berger v. United States*, 200 F.2d 818, 821 (8th Cir. 1952). The Act prohibits interstate commerce in adulterated foods. 21 U.S.C. § 331(a)–(c). It permits the FDA to petition a district court to enjoin such commerce. 21 U.S.C. § 332(a). Most important, it permits the FDA to stop interstate commerce in adulterated food by obtaining a court order to seize it:

> Any article of food . . . that is adulterated . . . when introduced into or while in interstate commerce or while held for sale (whether or not the first sale) after shipment in interstate commerce . . . shall be liable to be proceeded against while in interstate commerce, or at any time thereafter, on libel of information and condemned . . .

21 U.S.C. § 334(a)(1).

■ In light of this statutory scheme as a whole, we find no basis for the Association's distinction between the FDA's roles in preventing and remedying commerce in adulterated foods. In our opinion the Act imposes on the FDA an equal duty to perform each role. We conclude that the FDA's purposes in enacting the contested provisions of its Regulation, which were "to prevent the introduction of adulterated foods into [interstate] commercial channels", 40 Fed.Reg. 24,162 (1975), and to has-

ten their removal from circulation once there, *id.* at 24,169, reflect the objective of the Act and carry out its mandate. *See Ewing v. Mytinger & Casselberry, Inc.,* 339 U.S. 594, 601, 70 S.Ct. 870, 94 L.Ed. 1088 (1950); *United States v. 7 Barrels of Spray Dried Whole Eggs,* 141 F.2d 767, 770 (7th Cir. 1944). *See also United States v. Lexington Mill & Elevator Co.,* 232 U.S. 339, 409, 34 S.Ct. 337, 58 L.Ed. 658 (1914) (interpretation of predecessor statute).[11]

We think the FDA has reason to believe that source coding and the keeping of distribution records will expedite locating and removing adulterated food in two situations: (1) when one unit of a packaging or production lot already in commerce is found to be adulterated, and the other units in the same lot need to be found and removed; and (2) when a plant where food already in interstate commerce was processed is found to be unsanitary, and the plant's recent production needs to be found and removed. Coding will also facilitate segregation of an adulterated lot that is in a manufacturer's warehouse.

■ The Association and the FDA agree that when it is suspected that candy is adulterated, its manufacturer customarily recalls it in order to avoid condemnation proceedings under the seizure provision of the Act. We may assume that recalls are completely voluntary because the FDA does not have authority to mandate them, *United States v. C.E.B. Products, Inc.,* 380 F.Supp. 664, 672 (N.D.Ill.1974). Nonetheless we believe that the voluntary nature of recalls does not foreclose their regulation. When accommodation between the FDA

10. *United States v. 1500 Cases More or Less, Tomato Paste,* 236 F.2d 208, 215 (7th Cir. 1956).

11. We base our holding on the compatibility of the contested provisions of the Regulation with the whole statutory scheme, especially the grant of seizure authority in 21 U.S.C. § 334(a). Therefore we need not determine whether past judicial and administrative interpretations of section 402(a)(4) establish conclusively that its scope is solely "preventive" and not "remedial". The cases on which the Association relies,

*Berger v. United States,* 200 F.2d 818 (8th Cir. 1952) and *United States v. 1500 Cases More or Less, Tomato Paste,* 236 F.2d 208 (7th Cir. 1956), did not consider the possibility that the section might have a broader scope. We find little significance in the FDA's belated extension of a 39-year old statute from "prevention" to "remedy": the FDA's authority, if it existed under the section, did not die merely because it was dormant. *United States v. Morton Salt Co.,* 338 U.S. 632, 647–48, 90 S.Ct. 357, 94 L.Ed. 401 (1950).

and private industry has produced an efficient procedure for enforcing the Act, and when that procedure emphasizes voluntary cooperation in lieu of a more disruptive and cumbersome remedy specifically authorized by the Act, the FDA may regulate the procedure of voluntary cooperation. Moreover, it is proper for the FDA to conclude that it cannot rely exclusively on voluntary compliance to protect the public interest. Regulations that require source codes and distribution records may be based legitimately on the need to expedite seizure when voluntary recalls are refused.

In any case, the regulation must be consistent with Congressional intent and the substantive provisions of the whole statute. Section 701(a) is not a license for expansion of the FDA's regulatory authority based on fanciful interpretations of the substantive portions of the Act. In our opinion however the coding and record-keeping requirements here at issue clearly do not distend the scope of regulation authorized by the Act.

## ARBITRARINESS

■ As we have seen, the FDA justified its mandatory coding and record-keeping

provision on the ground that they would expedite the recall of adulterated food.[12] The Association complains that there is no evidence in the record to show (1) that recalls as presently conducted are not fast enough, and (2) that codes and records will make recalls faster. The FDA's position is that when the public health may be at stake, the fastest approach is the best one, and that when manufacturers are required to set up the means of tracing adulterated food, it is likely that the full lot of adulterated food will be located more accurately and removed more quickly. We believe that this is a rational justification for the contested provisions. A regulation that is self-evidently rational is not less legitimate than a regulation whose rationality must depend on elaborate statistical, expert, or other evidence.

The judgment of the District Court is

*Affirmed.*

**12.** The Regulation was promulgated after informal rulemaking. We believe that paragraphs 84, 85 and 92 of its order, 40 Fed.Reg. 24,168–69, provide a "concise general statement of [the] basis and purpose", (5 U.S.C. § 553(c)) of the contested provisions that was sufficiently detailed to permit judicial review. *Automotive Parts & Accessories Ass'n v. Boyd,* 132 U.S. App.D.C. 200, 208, 407 F.2d 330, 338 (1968); *National Nutritional Foods Ass'n v. Weinberger,* 512 F.2d 688, 701 (2d Cir.), *cert. denied,* 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975).