PHARMACEUTICAL MANUFACTUR-
ERS ASSOCIATION, Plaintiff,

The American College of Obstetricians and Gynecologists; National Association of Chain Drug Stores, Inc.; American Society of Internal Medicine; Private Medical Care Foundation, Inc., a corporation; Congress of County Medical Societies, Inc., a corporation; Pottawatomie County Medical Society, Inc., a corporation; Oklahoma State Medical Association; and Francis A. Davis, M. D., Plaintiffs-Intervenors,

v.

FOOD AND DRUG ADMINISTRATION; Joseph A. Califano, Jr., Secretary of Health, Education and Welfare; and Donald Kennedy, Commissioner of Food and Drug Administration, Defendants,

Consumers Union of United States, Inc.; Consumer Federation of America; National Women's Health Network; and Women's Equity Action League, Defendants-Intervenors.

Civ. A. No. 77–291.

United States District Court,
D. Delaware.

Feb. 11, 1980.

Richard L. Sutton, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Joel E. Hoffman, and Anthony L. Young, Wald, Harkrader & Ross, Washington, D. C., Bruce J. Brennan, and Edwin C. Mulcahy, Jr., Washington, D. C., Howard P. Hoeper, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., Thomas D. Quinn, Jr., Reasoner, Davis & Vinson, Washington, D. C., Carl Roberts, Associate Gen. Counsel, American Pharmaceutical Association, Washington, D. C., for plaintiff Pharmaceutical Manufacturers Association, plaintiffs-intervenors The American College of Obstetricians and Gynecologists and The National Association of Chain Drug Stores, Inc., and American Pharmaceutical Association, amicus curiae.

Mason E. Turner, Jr., Prickett, Sanders, Jones, Elliott & Kristol, Wilmington, Del., Don G. Holladay and A. P. Murrah, Jr., Andrews, Davis, Legg, Bixler, Milsten & Murrah, Inc., Oklahoma City, Okl., for plaintiffs-intervenors Private Medical Care Foundation Inc., Congress of County Medical Societies, Pottawatomie County Medical Society, Inc., Oklahoma State Medical Association, and Francis A. Davis, M.D.

James W. Garvin, Jr., U. S. Atty., John X. Denney, Jr., Asst. U. S. Atty., Wilmington, Del., Raymond W. Philipps, Consumer Affairs Section, Antitrust Div., Dept. of Justice, Washington, D. C., Richard M. Cooper, and Michael P. Peskoe, Food and Drug Administration, Dept. of Health, Education and Welfare, Rockville, Md., for defendants.

Aida Waserstein, Bader, Dorsey & Kreshtool, Wilmington, Del., and Mary C. Boudart, Wilmington, Del., Marcia D. Greenberger, and Margaret A. Kohn, Women's Rights Project, Center for Law and Social Policy, Washington, D. C., for defendants-intervenors Consumers Union of the United States, Inc., Consumer Federation of America, National Women's Health Network, and Women's Equity Action League.

## OPINION

STAPLETON, District Judge:

In this case, plaintiffs, the Pharmaceutical Manufacturers Association, the American College of Obstetricians and Gynecologists, the National Association of Chain Drug Stores, Inc., Private Medical Care Foundation, and others challenge the validity of a regulation promulgated by the Food and Drug Administration which requires certain information to be provided to patients for whom drugs containing estrogens are prescribed. The defendant agency has been joined by the Consumers Union of the United States, Inc., the Consumer Federation of America, the National Women's Health Network, and Women's Equity Action League (intervenor-defendants). The case is before me now on the parties' cross-motions for summary judgment.

The regulation in question, codified in 21 C.F.R. § 310.515, is one of only four regulations which require patient labeling to be dispensed with a prescription drug.[1] The regulation was proposed on September 29, 1976, with a notice of proposed rulemaking published in the *Federal Register* (41 Fed. Reg. 43108) permitting sixty days for comments. The regulation as proposed and as promulgated outlined several categories of information which must be included in a patient package insert, and required that such an insert be provided to a patient every time the drug was dispensed or administered (i. e., injected).[2] Thus, physicians as well as pharmacists are required to provide the labeling when they act as dispensers of the medication.

---

1. The others apply to oral contraceptives, 21 C.F.R. § 310.501, to progestational drug products, 21 C.F.R. § 310.516, and to isoproterenol inhalation preparations, 21 C.F.R. § 201.304. The agency's authority to require patient labeling on prescription drugs has never been subject to a court challenge.

2. Since the regulation was first promulgated, the agency has proposed changes which relax the dispensing requirements as to incompetents and eliminate them as to men.

The agency's action came a a result of several studies published in 1975 which indicated an association between the use of conjugated estrogens and an increased risk of endometrial cancer in women. The FDA convened its Obstetrics and Gynecology Advisory Committee to review the studies, and that Committee proposed changes in the physician labeling provided by manufacturers of estrogen.[3] Following the Committee's work, Joint Congressional hearings were conducted on January 21, 1976 to look into the matter of postmenopausal use of estrogens.[4] Among the witnesses were a panel of physicians who testified as to the association between estrogens and endometrial cancer, government representatives from both FDA and the National Institutes of Health and representatives of the pharmaceutical firm which manufactures the largest selling conjugated estrogen.

Following these hearings, the FDA published the proposed estrogen regulation for comments. The final rule, published July 22, 1977, was accompanied by a lengthy preamble (42 Fed.Reg. 37636) which attempted to deal with the comments the agency had received and to explain the purpose and effect of the rule. Also published along with the proposed regulation was a sample label which included all the information required by the regulation. 42 Fed.Reg. 37645 (July 22, 1977). The effective date of the regulation was to be September 20, 1977. Plaintiffs promptly filed this suit, however, and requested that the agency stay the effective date of the regulation pending the outcome of the suit. Consideration of the stay petition tolled the running of the sixty day period, making the effective date October 18, 1977. On October 5, 1977, I denied plaintiffs' motion for a preliminary injunction. Opinion of October 5, 1977. These motions for summary judgment followed.

Plaintiffs and plaintiff-intervenors raise a number of challenges to the regulation. First, they contend that the FDA lacks statutory authority to require patient packaging inserts for prescription drugs. They next assert that such a requirement is an unconstitutional interference with the practice of medicine. Finally, they challenge the adequacy of the FDA's findings and conclusions embodied in the preamble to the regulation and argue that, based on the administrative record, the regulation is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A) (1976). Because I find that the FDA does have statutory authority to require patient labeling, that such a requirement does not interfere with any constitutionally protected rights of physicians, that the agency's reasoning is sufficiently articulated and that the record adequately supports its judgment, I will grant the defendants' motion for summary judgment and deny that of the plaintiffs.

## I. THE STATUTORY BASIS OF THE REGULATION.

■ The Federal Food, Drug and Cosmetic Act of 1938, 21 U.S.C. § 301 *et seq.*, vests broad substantive rulemaking authority in the Secretary of Health, Education and Welfare. Section 701(a) of the Act, 21 U.S.C. § 371(a), grants to the Secretary the "authority to promulgate regulations for the efficient enforcement of this chapter." It is clear that this section authorizes the Secretary to promulgate binding, substantive regulations; the Secretary is not limited in his or her rulemaking to "interpretive" regulations or statements of policy. *Weinberger v. Hynson, Westcott and Dunning,* 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); *National Nutritional Foods Ass'n v. Weinberger,* 512 F.2d 688 (2d Cir. 1975). This authority of the Secretary has been delegated to the Commissioner of the

---

**3.** Certified Administrative Record, Doc. Nos. 000008–000193.

**4.** *Oral Contraceptives for Postmenopausal Use. Joint Hearings Before the Subcommittees on Health and the Com. on Labor and Pub. Wel-* *fare and the Subcom. on Administrative Practice & Procedure of the Senate Judiciary Committee,* 94th Cong., 2d Sess. (1976), Doc. No. 000194.

FDA who promulgated the regulation here challenged.[5]

 The primary objective of the Federal Food, Drug and Cosmetic Act is the protection of the public health. *United States v. An Article of Drug, Bacto-Unidisk*, 394 U.S. 784, 798, 89 S.Ct. 1410, 1418, 22 L.Ed.2d 726 (1969). As such, its rulemaking authority under Section 701(a) has been broadly construed to uphold a wide variety of assertions of regulatory power. As Judge Gurfein of the Second Circuit Court of Appeals wrote in *United States v. Nova Scotia Foods Products*, 568 F.2d 240 (2d Cir. 1977):

> We read [Section 701(a)] as analogous to the provision "make . . . such rules and regulations as may be necessary to carry out the provisions of this Act," in which case "the validity of a regulation promulgated thereunder will be sustained so long as it is 'reasonably related to the purposes of the enabling legislation.'" *Mourning v. Family Publications Services, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, [1660,] 36 L.Ed.2d 318 (1973). When agency rulemaking serves the purposes of the statute, courts should refuse to adopt a narrow construction of the enabling legislation which would undercut the agency's authority to promulgate such rules.

568 F.2d at 246.

At the same time, the broad language of Section 701(a) does not give the FDA unlimited regulatory powers; regulations issued under that section must effectuate a Congressional objective expressed elsewhere in the Act. In the instant case, the agency maintains that it has promulgated the challenged regulation pursuant to Section 701(a) in order to effectuate the objectives reflected in Sections 502(a) and 505(d) of the Act, 21 U.S.C. §§ 352(a) and 355(d).

### A. *Section 502.*

Section 502 reads in pertinent part:

> A drug or device shall be deemed to be misbranded—

(a) If its labeling is false or misleading in any particular.

\*　　\*　　\*　　\*　　\*　　\*

(f) Unless its labeling bears (1) adequate directions for use; and (2) such adequate warnings against use in those pathological conditions or by children where its use may be dangerous to health, or against unsafe dosage or methods or duration of administration or application, in such manner and form, as are necessary for the protection of users: Provided, That where any requirement of clause (1) of this subsection, as applied to any drug or device, is not necessary for the protection of the public health, the Secretary shall promulgate regulations exempting such drug or device from such requirement.[6]

Section 201, 21 U.S.C. § 321, the "Definition" section of the Act, describes the concept of "misleading" in the following terms:

(n) *If an article is alleged to be misbranded because the labeling is misleading, then in determining whether the labeling is misleading there shall be taken into account,* (among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also *the extent to which the labeling fails to reveal facts* material in the light of such representations or *material with respect to consequences which may result from the use of the article to which the labeling relates under the conditions of use prescribed in the labeling thereof or under such conditions of use as are customary or usual.* (emphasis supplied)

 These statutory provisions, combined with Section 701(a), provide direct support for the challenged regulation. Among other things they reflect a clear Congressional objective that the users of drugs, whether

---

**5.** 21 C.F.R. § 5.1(a).

**6.** These misbranding provisions of Section 502 are applicable to any sale involving drugs sub-

ject to the Act after shipment in interstate commerce, and thus are applicable to intrastate transactions. 21 U.S.C. § 331(k).

prescription or non-prescription, shall receive facts "material . . . with respect to consequences which may result from the use of the . . . [drug] under the conditions of use prescribed in the labeling thereof or under such conditions of use as are customary or usual." The Commissioner, in furtherance of this objective, has seen fit in the challenged regulation to require that information concerning consequences which may result from the use of estrogen drugs be provided to the users thereof on their labeling. I think it clear that Section 701(a) authorizes him to do so.

The plaintiffs acknowledge that Sections 201 and 502 may be read in this manner, but maintain that this reading is contrary to the legislative history of the 1938 Act and is specifically precluded by the enactment of the Durham-Humphrey amendments to the Act in 1951.

Relying on the legislative history of the 1938 Act, the plaintiffs assert that Section 502(a) was never intended to apply to drugs dispensed on prescription. I find nothing in that legislative history to support this position. Indeed, all the evidence persuades me that the opposite is true. Despite a number of requests from representatives of the medical profession that prescription drugs be exempted from all labeling requirements,[7] the final version of the Act provided an exemption only with respect to certain identified requirements. Section 503(b) exempted any drug dispensed on a written prescription from the labeling requirements of Section 502(b) (relating to quantity of contents) and 502(e) (relating to common names), and exempted prescription

narcotics from the requirement that the label carry a warning that the drug may be habit forming, so long as the prescription was not refillable.[8] It did not, however, exempt prescription drugs from the requirements of either 502(a) or 502(f), and both were understood to apply fully to all drug preparations.[9]

Alternatively, the plaintiffs argue that, even if Section 502(a) applies to prescription drugs, that section and Section 201(n) require affirmative disclosures in the form of warnings or qualifying information only when affirmative claims of curative effect are made on the labeling which, in the absence of additional information, would be misleading. Plaintiffs point to a portion of the House Committee Report on the 1938 Act as evidence that 201(n) was to require disclosure only in this narrow circumstance.

> Certainly a consumer seeking a remedy for a disease condition has the right to know, when it is a fact, that the representations of curative value have only a narrow and limited support, and if the labeling fails to reveal that fact, which is a material fact in light of the representations made, then the labeling may be regarded as misleading. However, the misleading character of the label may be corrected by an appropriate qualifying statement revealing this material fact.

H.R.Rep.No.2139, 75th Cong., 3d Sess. (1938), reprinted in Dunn, Federal Food, Drug & Cosmetic Act 822 (1938).

While it is true that one of the important applications of Section 201(n) relates to the problem of misleading affirmative claims, nothing in the Report suggests that the

---

7. See, e. g., Hearings on S. 5 Before a Subcom. of the Senate Commerce Com., 74th Cong., 1st Sess. (1935) at 158; Hearings on H.R. 6906 Before a Subcom. of the House Com. on Interstate and Foreign Commerce, 74th Cong., 1st Sess. (1935) at 316, 322.

8. The discussion of an earlier version of the 1938 Act, quoted by plaintiffs at pp. 23–24 of their brief, which indicated that warnings would not be required on doctors' prescriptions, was addressed to the question of warning labels on prescription narcotics. Congressional concern about the possible adverse effect of

such warnings was reflected in the exemption contained in 503(b).

9. Section 502(f) authorized the Secretary to exempt any drug from the "adequate directions for use" requirement if such directions are not necessary for the protection of the public health, but did not authorize an exemption from the warnings requirement of that subsection. After the passage of the 1938 Act, the Administrator did exempt drugs dispensed by prescription from the directions for use requirement. 21 C.F.R. § 1.106, 3 Fed.Reg. 3168 (Dec. 28, 1938).

section is limited in its application to such claims. Indeed, the text of Section 201(n) itself demonstrates that its scope is not so limited. Plaintiffs focus on that portion of the section which defines as misleading any failure to "reveal facts material in the light of . . . [the] representations" made on the labeling. But Section 201(n) goes on to require the disclosure of "facts . . . material with respect to consequences which may result from the use" of the drug. This language would be rendered meaningless if this Court were to adopt the construction favored by the plaintiffs.

Finally, plaintiffs argue that any authority which the FDA may have had under the 1938 Act with respect to patient labeling of prescription drugs was withdrawn by Congress in 1951. One of the amendments adopted in that year exempted prescription drugs from the "warnings against misuse" requirement and the "adequate directions for use" requirement of Section 502(f) in those situations where the label contains certain specified information, including whatever warnings or directions for use are specified by the physician in the prescription.[10] According to plaintiffs, the adoption of this exemption as Section 503(b)(2) of the Act was intended by Congress to deprive the Secretary of authority to require that patient labeling for prescription drugs contain information regarding possible undesir-

able effects of the prescribed use. I do not agree.

There is woefully little discussion in the House and Senate hearings or reports concerning the decision to exempt prescription drugs from Section 502(f). One of the few direct references to the exemption provision came in Federal Security Administrator Oscar Ewing's remarks to the House and Senate subcommittees in which he states:

> We think [the warning requirement of 502(f)(2)] is unnecessary when there is a doctor's prescription on which the drug is given out.

> These have chiefly to do with warnings against misuse which the statute requires in certain cases. These warnings we believe are quite unnecessary when the drug is used in accordance with the doctor's orders; that is, when the doctor takes the responsibility that the drug will be properly used.

*Hearings on H.R. 3298 Before the House Committee on Interstate and Foreign Commerce,* 82nd Cong., 1st Sess. pp. 20–21.[11]

It is thus true that the 1951 exemption of prescription drugs from the requirements of Section 502(f) was enacted with the idea that prescribing physicians would be the primary source of adequate directions for use and adequate warning against misuse or overuse. It does not necessarily follow,

10. Section 503(b)(2), 21 U.S.C. § 353(b)(2) provides in part:

> (a) Any drug dispensed by filling or refilling a written or oral prescription of a practitioner licensed by law to administer such drug shall be exempt from the requirements of section 352 of this title [Section 502 of the Act] except subsections (a), (i)(2) and (3), (k), and (l) of said section, and the packaging requirements of subsections (g), (h), and (p) of said section, if the drug bears a label containing the name and address of the dispenser, the serial number and date of the prescription or of its filling, the name of the prescriber, and, if stated in the prescription, the name of the patient, and the directions for use and cautionary statement, if any, contained in such prescription. . . .

11. See also *Hearings on S. 1186 and H.R. 3298 Before the Subcommittee on Health of the Senate Committee on Labor and Public Welfare,* 82nd Cong., 1st Sess. (1951), at 164–65. The American Pharmaceutical Association, as *ami-*

*cus curiae,* argues that the exemption was intended to protect pharmacists against the risk of criminal prosecutions for failing to provide adequate warnings on prescription drugs. The legislative history of the 1951 amendments reveals, however, that this particular problem was virtually never addressed either by pharmacist groups testifying about the bill or by congressmen supporting it. The problems which most concerned pharmacists, and about which most of the testimony centered, involved the lack of uniformity in the labeling of drugs by manufacturers which left pharmacists in doubt as to whether a drug was to be sold by prescription only, the lack of statutory authorization for oral prescriptions and refilling of prescriptions, and the lack of a statutory definition or administrative listing of prescription drugs. These problems are addressed in the legislation in Sections 503(b)(1)(B), 503(b)(1)(ii) and (iii), and 503(b)(4).

however, that Congress meant to strip the Commissioner of the regulatory authority he had possessed for thirteen years over prescription drug labeling.

Plaintiffs' argument glosses over the fact that while prescription drugs were exempted from the requirements of Section 502(f) in 1951, they were not exempted from the requirement of Section 502(a), that their labels not be misleading. Thus, the Senate Report states:

> Paragraph (2) of the new subsection (b) provides that a drug dispensed on prescription shall be exempt from the provisions of the act relating to misbranding of drugs except those which specify that a drug shall be deemed to be misbranded if its labeling is false or misleading in any particular. (Sec. 502(a)) . . . These provisions continue to apply to any drug subject to the act, whether sold over-the-counter or on prescription.

S.Rep.No.946, 82nd Cong., 1st Sess. (1951), *reprinted in* [1951] U.S.Code Cong. & Admin.Serv., pp. 2454, 2462.

Thus, while plaintiffs are correct in pointing out that the effect of the Section 503(b)(2) exemption as enacted in 1951 was to make the prescribing physician the primary source of information available to a consumer of a prescription drug, this does not mean that Congress intended to leave this matter to the unregulated discretion of the prescribing physician. The retention of Section 502(a) as a regulatory provision applicable to prescription drugs precludes one from attributing that intention to Congress. The long and short of the matter is that Congress intended patients using prescription drugs, as well as those using over-the-counter drugs, to receive "facts material with respect to consequences which may result from the use of the [drug] . . . under the conditions of use prescribed in the labeling or under such conditions of use as are customary and usual." Given this Congressional objective, I conclude that when the Commissioner determines that the possible side effects of a drug when used as customarily prescribed are sufficiently serious as to be material to the patient's deci-

sion on use of the drug, he or she may require disclosure of those side effects on the labeling pursuant to Section 701(a).

One further point deserves comment. Congress is now considering a bill which not only makes explicit the FDA's authority to require patient labeling, but would mandate such labeling in the case of all drugs. As recently passed by the Senate, S.B. 1075 would allow a physician to withhold such labeling only if "the Secretary has determined that, in light of the circumstances relating to the nature, use, or method of administration of the drug, it would be detrimental to the health of patients in some circumstances to deny practitioners the authority to withhold such labeling." S.B. 1075, Sec. 117 (125 Cong.Rec. S13472 (daily ed. Sept. 26, 1979)).

Plaintiffs argue that the very fact that Congress is considering this proposal is evidence that the FDA does not now have the power it seeks to assert. I cannot agree. In the first place, there are important differences between the legislation now being considered—which would require patient labeling for all drugs—and a specific administrative determination that, due to the peculiarities of a particular drug and its customary use, its labeling would be "false or misleading" without specific additional information. In the second place, the existence of pending legislation specifically authorizing certain agency action does not render invalid existing regulations concerning the same action. *See National Confectioners Ass'n v. Califano*, 187 U.S.App.D.C. 35, 38 n. 9, 569 F.2d 690, 693 n. 9 (D.C. Cir. 1978).

**B.** *Section 505(d).*

█ The government also argues that the challenged regulation furthers the Congressional objectives reflected in Section 505(d), 21 U.S.C. § 355(d). This section deals with the FDA's process of approving new drug applications without which new drugs cannot be marketed. Section 505(d) requires the Secretary to disapprove a new drug application if he or she finds that:

> (1) the investigations, reports of which are required to be submitted to the Secre-

tary pursuant to subsection (b) of this section, do not include adequate tests by all methods reasonably applicable to show whether or not such drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof; (2) the results of such tests show that such drug is unsafe for use under such conditions or do not show that such drug is safe for use under such conditions; or . . . (6) based on a fair evaluation of all material facts, [the proposed] labeling is false or misleading in any particular . . .

The government argues that the regulation came as a result of new studies which showed that estrogen may be "unsafe for use" under the conditions prescribed in the labeling, and that the Commissioner determined in light of these studies that labeling which did not disclose the risks involved would be misleading.

While I agree that the section, and particularly the addition in 1962 of the sixth ground for disapproval,[12] reflects Congress' continuing concern that drug labeling should be both truthful and complete, I cannot agree that it provides independent support for the challenged regulation. Section 505(d) cannot fairly be read to encompass authority for requiring the delivery of written material to the patient at the time of dispensing. As the FDA itself has explained, the provisions of Section 505, as contrasted with the mislabeling provisions of the Act, "apply only ·at the moment of shipment in interstate commerce and not to action taken subsequent to shipment in interstate commerce." Notice of Proposed Rule Making, 37 Fed.Reg. 16503 (1972). As indicated above, however, it is unnecessary to find support for the challenged regulation in the new drug sections of the Act, since Section 502 and Section 701 provide ample authority for its promulgation.

## II. THE CONSTITUTIONAL CHALLENGE TO THE REGULATION.

■ I next turn to the question of whether requiring patient package inserts to be dispensed with prescription drugs interferes with any constitutionally protected right of physicians. Plaintiffs argue that the mandatory nature of the regulation interferes with the doctor-patient relationship, and thus with the practice of medicine, by requiring the physician to communicate information emanating from Washington without regard to his or her professional judgment concerning the accuracy of the advice or the desirability of the patient being exposed to it.

The plaintiffs' argument is founded in part on their conception of the appropriate distribution of regulatory authority between the states and the federal government and in part on their view that a licensed physician's professional judgment may not be subjected to prior restraint and that society's interest in regulating the practice of medicine can be satisfactorily served by review of physician conduct in the context of malpractice or professional censure proceedings.

■ To the extent that the plaintiffs' claim of unconstitutional interference with the right to practice medicine is founded on a notion of federalism which reserves all rights over such regulation to the states, it is without merit. It is undisputed that the practice of medicine is subject to the exercise of state police power where such regulation furthers a legitimate state interest. *Lambert v. Yellowley*, 272 U.S. 581, 47 S.Ct. 210, 71 L.Ed. 422 (1926); *Poe v. Menghini*, 339 F.Supp. 986 (D.Kan.1972). But that assumption does not imply an absence of federal jurisdiction over the same area, where the federal regulation constitutes a reasonable exercise of a power vested in Congress under the Constitution. *James Everard's Breweries v. Day*, 265 U.S. 545, 44 S.Ct. 628, 68 L.Ed. 1174 (1921). As the Supreme Court has observed:

That the United States lacks the police power, and that this was reserved to the ·states by the Tenth Amendment, is true. But it is none the less true that when the United States exerts any of the powers

---

12. Pub.L. 87–781, § 102(c) (1962).

conferred upon it by the Constitution, no valid objection can be based upon the fact that such exercise may be attended by the same incidents which attend the exercise by a state of its police power, or that it may tend to accomplish a similar purpose.

Hamilton v. Kentucky Distilleries and Warehouse Co., 251 U.S. 146, 156, 40 S.Ct. 106, 108, 64 L.Ed. 194 (1919).

The Federal Food, Drug & Cosmetic Act "rests upon the constitutional power resident in Congress to regulate interstate commerce," and its validity under that clause has been upheld. United States v. Walsh, 331 U.S. 432, 434, 67 S.Ct. 1283, 1284, 91 L.Ed. 1585 (1947).[13] The fact that the practice of medicine is an area traditionally regulated by the states does not invalidate those provisions of the Act which may at times impinge on some aspect of a doctor's practice.

Turning to plaintiff's view of a physician's right to exercise professional judgment, it is important to focus on what the challenged regulation does not do. The regulation at issue here does not forbid a physician from prescribing conjugated estrogen drugs, or limit the physician's exercise of professional judgment in that regard. Nor does it limit the information the physician may impart to his or per patients concerning estrogens. If the physician disagrees with a perceived "slant" of the labeling provided by the manufacturer, or with the facts stated therein, he or she is free to discuss the matter fully with the patient, noting his own disagreement and views.[14] The sample labeling encourages the patient to have this kind of open discussion with her doctor.

When these limitations on the effect of the challenged regulation are considered, it becomes apparent that the plaintiffs urge recognition not of a right to exercise judgment in prescribing treatment, but rather of a right to control patient access to information. As I pointed out in my earlier Opinion, labeling is only one of many sources from which patients receive information about drugs and the control which the plaintiffs claim to have possessed prior to the challenged regulation is largely illusory. But there is a more fundamental problem with their position. There simply is no constitutional basis for recognition of a right on the part of physicians to control patient access to information concerning the possible side effects of prescription drugs. The cases cited by plaintiffs do contain language referring to a doctor's right to practice medicine, but the rights there recognized were only those necessary to facilitate the exercise of a right which patients were found to possess. The physician rights discussed are thus derivative of patient rights and do not exist independent of those rights. The Supreme Court pointed this out in Whalen v. Roe, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977):

> The doctors rely on two references to a physician's right to administer medical care in the opinion in Doe v. Bolton, 410 U.S. 179 at 197–198 and 199 [, 93 S.Ct. 739 at 750 and 751, 35 L.Ed.2d 201] . . . Nothing in that case suggests that a doctor's right to administer medical care has any greater strength than his patient's right to receive such care. The constitutional right vindicated in Doe was the right of a pregnant woman to decide whether or not to bear a child without unwarranted state interference. The statutory restrictions on the abortion pro-

---

**13.** The misbranding provisions of the Act constitute a valid exercise of the power conferred by the commerce clause even though they apply to intrastate transfers and administrations following an interstate shipment of the drug. United States v. Sullivan, 332 U.S. 689, 68 S.Ct. 331, 92 L.Ed. 297 (1948).

**14.** As I read the regulation, if a doctor feels the manufacturer's labeling is slanted or unduly

alarming, he or she has the additional alternative of preparing substitute labeling so long as that labeling covers the subject matter required by the regulation. As earlier noted, the guideline at 41 Fed.Reg. 43108 and updated at 42 Fed.Reg. 37645 is not mandatory. It is simply a sample text which may be relied on as complying with the requirements of the regulation.

cedures were invalid because they encumbered the woman's exercise of that constitutionally protected right by placing obstacles in the path of the doctor upon whom she was entitled to rely for advice in connection with her decision. If those obstacles had not impacted upon the woman's freedom to make a constitutionally protected decision, if they had merely made the physician's work more laborious or less independent without any impact on the patient, they would not have violated the constitution.

429 U.S. at 604, n. 33, 97 S.Ct. at 879, n. 33.

The patient rights recognized in the line of cases relied upon by plaintiffs flow from a constitutionally protected right of privacy. As the Supreme Court noted in *Whalen*, this right encompasses the individual's "interest in independence in making certain kinds of important decisions," as well as his or her "interest in avoiding disclosure of personal matters." *Id.* at 599–600, 97 S.Ct. at 876. To the extent these cases have any bearing on the present issue, then, their rationale would appear to support the challenged regulation. The objective of that regulation is to provide the patient with the facts relevant to a choice about the use, and manner of use, of estrogen drugs. The asserted right to limit patient access to such information can hardly be said to facilitate the patient's "interest in independence" in decision making.[15]

By holding that physicians do not possess the constitutional right which plaintiffs claim, I do not overlook the affidavits of numerous experienced physicians who foresee patient anxiety and ruptured physician-patient relationships as a result of the implementation of the regulation. These matters are clearly relevant to an evaluation of the wisdom of the regulation. They do not, however, render it constitutionally infirm.

## III. THE CHALLENGE TO THE ADMINISTRATIVE RECORD AND PREAMBLE.

Finally, I turn to the claims that the Commissioner failed to provide "a concise general statement of [the] . . . basis and purpose" of the challenged regulation as required by Section 4(b) of the APA [16] and that his decision to promulgate it was "arbitrary, capricious, [and] an abuse of discretion" in violation of Section 10(e) of that Act.[17] More precisely, plaintiffs claim Sections 4(b) and 10(e) were ignored, not with respect to the primary decision to require patient labeling of estrogen drugs, but rather with respect to the subsidiary decision not to provide an exception for those cases in which the prescribing physician considers it more desirable to withhold the information from the patient.

■ Section 4(b) of the APA does not require specific and detailed findings and conclusions of the kind customarily issued by the decisionmaker in adjudicative proceedings. What is required is a statement of reasons for the agency action of sufficient content to permit judicial review. *National Nutritional Foods Ass'n v. Weinberger*, 512 F.2d 688 (2nd Cir. 1975). In a case like the present one, where the "arbitrary, capricious" standard of review is applicable, this means that the concise general statement must be sufficient to permit a determination of whether the administrative decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). It is not necessary in order to permit such a determination that the decisionmaker fully explain his or

---

**15.** The "important decisions" referred to in *Whalen* were decisions involving marriage, procreation, contraception, family relationships, and child rearing and education. For present purposes, I may assume that patients have a constitutionally protected privacy interest in making important decisions concerning all medical treatment free of unwarranted governmental interference. *But see Paul v. Davis*, 424

U.S. 693, at 713, 96 S.Ct. 1155, at 1166, 47 L.Ed.2d 405, noted by the *Whalen* Court at 600 n. 26, 97 S.Ct. at 876 n. 26, which suggests that the areas of protection are more limited.

**16.** 5 U.S.C. § 553(c).

**17.** 5 U.S.C. § 706.

her view on every issue resolved in the course of the administrative proceeding. *Kennecott Copper Corp. v. Environmental Protection Agency*, 149 U.S.App.D.C. 231, 462 F.2d 846 (D.C.Cir.1972). It is ordinarily sufficient if the statement identifies the major issues of policy which were raised in the course of the proceeding and explains why the agency reacted as it did. *Automotive Parts & Accessories Ass'n v. Boyd*, 132 U.S.App.D.C. 200, 407 F.2d 330 (D.C.Cir. 1968); *American Medical Ass'n v. Mathews*, 429 F.Supp. 1179 (D.Ill.1977); *Hiatt Grain & Feed, Inc. v. Bergland*, 446 F.Supp. 457 (D.Kan.1978).

The preamble to the challenged regulation provides a concise general statement of its basis and purpose. The evidence supporting the decision to require patient labeling is reviewed and the major concerns addressed in the comments are noted and responded to. In particular, the Commissioner notes that he had considered whether to allow the prescribing physician to determine that the labeling should not be given to a particular patient, but that "such [an] option is not provided in this regulation." 42 Fed.Reg. 37639–40 (July 22, 1977).

The reasons for the denial of such an option are also sufficiently articulated to permit a determination that it has a rational basis. Given the purposes of the Act and its mislabeling provisions, the touchstone of any decision of the Commissioner is the safety and health of the patient. With this touchstone in mind, the primary factors to be weighed in deciding to grant or deny the option for which plaintiffs press are (1) the extent and character of the risk involved in using estrogen drugs, (2) the efficacy of, or the benefit to be derived from, providing patients with information concerning that risk, and (3) the extent and character of any risk involved in exposing *all* patients to that information. The Commissioner explains his views in each of these areas. First, it is apparent that he considers the risk associated with the use of estrogen drugs to be great, in terms of both the number of users and the gravity of the consequences to those who are adversely affected. Second, he explains that he finds this to be an area where patients are capable of understanding the advantages and risk of use and where most patients, because of the nature of the condition for which the drug is prescribed, have a real option to use or not to use it. And, finally, on the other side of the balance, the Commissioner states that, unlike the situation with respect to some other drugs, he finds no likelihood of a substantial adverse effect on patients from exposure to the information provided by the labeling. Based on these considerations, the decision was made against affording the option.

I do not understand plaintiffs to contend that a reasonable person could not have assessed the risk of use and the efficacy of providing information to patients in the way the Commissioner did. They vigorously dispute his finding, however, with respect to the absence of substantial adverse effect from use of the labeling. Specifically, they point to affidavits filed in this case in which experienced physicians note their concerns that for some patients exposure to the labeling information will result in unnecessary anxiety, failure to follow prescribed treatment, ruptured doctor-patient relationships, self-diagnosis, and symptoms by suggestion.

The question before the Court, however, is not whether evidence exists which would tend to support an approach different from that taken by the Commissioner; the question is whether the record affirmatively demonstrates that the Commissioner's action had a rational basis. As earlier noted, I conclude that the preamble provides such assurance. In addition to the material already described, the preamble expressly addresses and evaluates the possibility of discontinued treatments, suggestion-induced symptoms, self-diagnosis, and strained doctor-patient relations.[18] With respect to the

---

18. While it is true that the preamble contains little reference to the possibility of unnecessary anxiety, this deficiency is not a fatal one. First of all, plaintiffs have not shown that the comments before the Commissioner focused upon this as a major concern. But more important-

patient compliance with prescribed dosage regimen and suggestion-induced side effects, for example, the Commissioner commented:

> . . . The factors behind patient adherence to agreed medication regimens are complex. With the present state of knowledge it is impossible to predict accurately the influence that patient labeling will have on adherence to agreed medication regimens.
>
> Experience with oral contraceptive patient labeling suggests, however, that patient experience with drug therapy, rather than written information, primarily determines discontinuation of drug therapy. Furthermore, in the case of estrogens, the Commissioner firmly believes patients should take these drugs for as brief a period as possible and that women should be appraised of the reasons why this is the case. In the suggested wording of the patient labeling, patients are consistently referred to their physician so that decisions can be made in the context of appropriate medical advice.
>
> If a patient decides to follow the instruction of her physician, the Commissioner does not believe that patient labeling will significantly increase the incidence of suggestion-induced side effects. Suggestion effects, moreover, seem to play a minimal role in determining serious adverse reactions. It is, in any event, possible to hypothesize beneficial as well as negative effects of suggestion. Clear expectations about the effects of drug therapy, reinforced by patient labeling, may make patients more sensitive and aware of certain physical or psychological reactions. Effects which might otherwise go unnoticed may be identified as drug related. Although this may have the effect of nominally increasing the reported incidence of less serious adverse reaction it also may have beneficial results. Patients may be more sensitive to "warning signals" of serious adverse effect. . . . It is the Commissioner's opinion that the possible positive effects of supplying accurate side-effect information outweigh the possible negative effects.

While reasonable minds might reach different conclusions, this explication of the Commissioner's reasoning is sufficient to demonstrate that the challenged regulation is the product of a rational process.

Plaintiffs complain, however, that, even if the Commissioner has provided a sufficient explanation of his reasoning and analysis, the absence from the administrative record of a factual basis for that reasoning and analysis renders his action arbitrary and capricious. They point specifically to the absence of any clinical or expert opinion evidence to support the Commissioner's view that no substantial adverse consequence can be expected to flow from the receipt by patients of the labeling information.[19]

To be rational, informal agency decisionmaking must have a factual basis.

---

ly, I think it apparent from the preamble as a whole that the Commissioner recognized that the labeling would cause unnecessary anxiety to some, but expected this to lead to doctor-patient dialogue which would have an ameliorative and informative effect. It is also apparent from the preamble that the Commissioner did not view all anxiety about estrogen use as inappropriate or as an adverse consequence of the required disclosure.

19. The record clearly provides support for the Commissioner's conclusions that estrogen use involves substantial risks and that there are benefits to be derived from dissemination of the required information to patients. The record discloses numerous studies linking the use of estrogens to serious, life-threatening illnesses including, among others, endometrial carcino-

ma. *See, e. g.,* Doc. Nos. 3074, 3078, 3082, 3101, 3183, 3201. It reveals that conjugated estrogens are prescribed most frequently for menopausal symptoms, such as "hot flashes", which though they can be severe, are not life-threatening. Furthermore, the record clearly reflects tremendous overutilization of the drug. *See, e. g.,* Doc. No. 194. The Commissioner also had reason to believe that many women were not receiving full and complete warnings from their physicians concerning the dangers of prolonged use of estrogen. The record is replete with letters from women relating their experiences with estrogens and with their doctors, and urging the Commissioner to require warnings in all cases. *E. g.,* Doc. Nos. 947, 955, 992, 1003, 1010, 1012, 1016, 1020.

This does not mean, however, that the administrative record must contain evidence to support each step in the agency's reasoning process. A determination of whether an agency action is rendered arbitrary and capricious by the absence of record evidence in a particular area necessarily depends on the circumstances, including such things as the character of the finding or conclusion said to be lacking in support, its importance in the deliberative process, whether it is a matter with which the agency has regular experience and expertise, the availability of competent evidence on the issue, and the character of any contrary evidence offered by commentors.[20]

■ Here, in order to pass upon the contention that a physician option should be provided, the Commissioner was called upon to forecast possible patient reaction to the labeling information. This was a matter with respect to which the agency had had some relevant prior experience. At the same time, patient labeling was a relatively new phenomenon and, the record suggests that clinical data on its effect was not yet available.[21] Moreover, the issue was one as to which a rational judgment could be made based on the Commissioner's specific knowledge of the information to be conveyed and his general knowledge of human nature, at least in the absence of any evidence suggesting that patterns of common experience were likely to be misleading. In this context, I believe the Commissioner was entitled to make a forecast without supporting clinical data or expert opinion.[22]

The challenged regulation is not arbitrary, capricious, or otherwise contrary to law and defendants' motion for summary judgment will be granted.

---

20. *See, generally,* 1 K. Davis, *Administrative Law* §§ 613–617 (2 ed. 1978).

21. The Commissioner indicates this in his preamble and no such data was submitted by any of those tendering comments.

---

22. *Cf. National Confectioners Ass'n v. Califano,* 187 U.S.App.D.C. 35, 569 F.2d 690 (D.C.Cir. 1978); *Ethyl Corp. v. E. P. A.,* 176 U.S.App. D.C. 373, 395, 541 F.2d 1, 23 (D.C.Cir.1976).